Case 4:19-cv-00652 Document 55 Filed on 05/20/20 in TXSD Page 1 of 18

United States District Court
Southern District of Texas
**ENTERED**
May 20, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IMPACT FLUID SOLUTIONS LP; aka IMPACT FLUID SOLUTIONS LLC, | § § § § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:19-CV-00652 |
| | § | |
| BARIVEN SA, *et al*, | § § | |
| Defendants. | § § | |

## **ORDER**

In February 2019, Plaintiff Impact Fluid Solutions LP ("Impact") filed this suit against Bariven SA ("Bariven"), and its subsidiaries PDVSA Services, B.V. and PDVSA Services, Inc. On its face, this appears to be a relatively straight-forward action. Plaintiff alleges that it entered into two supply contracts to provide Defendants with drilling fluids. Plaintiff claims that it performed its obligations pursuant to these contracts, and that Defendants failed to make the corresponding payments.

Nevertheless, in the case's infancy, Plaintiff's allegations have taken something of a backseat to a battle over the control of the Bolivarian Republic of Venezuela ("Venezuela" or the "Republic") and its instrumentalities. Defendant Bariven and the subsidiaries named in this suit are wholly owned, directly or indirectly, by Venezuela's state-owned oil company Petroleos de Venezuela, S.A. ("PDVSA"). In January 2019, following a controversial presidential election, the National Assembly of Venezuela declared the presidency of Nicolás Maduro to be illegitimate, and opposition leader Juan Guaidó was appointed as Interim President. In February 2019, at the instruction of representatives of Maduro, Defendants retained GST LLP ("GST") as their counsel. In June 2019, Hogan Lovells US LLP ("Hogan Lovells") filed a motion to replace GST as counsel

1

based upon instructions from representatives of Interim President Juan Guaidó. (Doc. No. 23). GST and (allegedly) the Defendants opposed this motion. (Doc. No. 25).

The Court temporarily stayed this litigation to allow time for this controversy to resolve itself. That stay dissolved without any resolution, and Hogan Lovells renewed their motion to substitute. (Doc. No. 32). GST responded in opposition (Doc. No. 35), and Hogan Lovells replied (Doc. No. 38). Understanding that delicate issues of foreign policy might be at stake in this dispute, this Court requested the United States file a Statement of Interest pursuant to 28 U.S.C. § 517.[1] The United States filed a brief in support of granting the motion to substitute, accompanied by a letter from Ambassador Michael G. Kozak, Acting Assistant Secretary for Western Hemisphere Affairs. *See* (Doc. No. 43). Finally, the Court held a hearing, and each side submitted supplemental briefs. *See* (Doc. Nos. 52 & 53).

The Supreme Court has held that the text and structure of the Constitution dictate that the Executive Branch holds the exclusive power to recognize foreign nations and governments. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015). At the same time, this Court notes the practicalities of litigation require some level of *de facto* control over a company to help a case progress through the discovery stages to a formal conclusion. This motion presents a somewhat thorny issue: who may appoint a state-owned company's legal representative in a commercial lawsuit filed against it, the legitimately recognized government with *de jure* control, but perhaps not *de facto* control over the company or the company's board of directors and general counsel acting on behalf of the regime that has been deemed illegitimate. The Court finds authority is vested in the former and grants Defendants' opposed motion to substitute counsel. (Doc. No. 35).

---

[1] Under 28 U.S.C § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

2

# I.

Although there were years of political turmoil preceding this case,[2] the facts underlying the present dispute revolve around the 2018 Presidential election in Venezuela and the events thereafter. After disqualifying members of opposition parties, incumbent Nicolas Maduro claimed victory in the election. On January 10, 2019, Maduro was sworn in for his second term in office. On January 15, 2019, Venezuela's legislative body, the National Assembly, declared Maduro's presidency illegitimate. On January 23, 2019, the National Assembly invoked Article 233 of the Venezuelan Constitution and named Juan Guaidó, the President of the National Assembly, as the Interim President of Venezuela.

The United States, alongside other countries, came out in support of the Guaidó Government. The same day Guaidó was appointed by the National Assembly, the United States President issued a statement "officially recognizing the President of the Venezuelan National Assembly, Juan Guaidó as the Interim President of Venezuela." The White House, *Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaidó as the Interim President of Venezuela* (Jan. 23, 2019), available at https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-interim-president-venezuela/. "The United States accepted Guaidó's representative to the United States, Carlos Vecchio, as Chargé d'Affaires of the Venezuelan Embassy on January 27, 2019, and on February 5, 2019, the Department of State's Chief of Protocol received Vecchio's credentials as Venezuelan ambassador to the United States." (Doc. No. 43-1 at 2). A year later, Ambassador Kozak, in a letter to this

---

[2] For a more detailed history of the conflict, *see Jimenez v. Palacios*, No. CV 2019-0490-KSJM, 2019 WL 3526479, at *2–*7 (Del. Ch. Aug. 2, 2019), as revised (Aug. 12, 2019)

3

Court, reiterated that "[t]he United States remains steadfast in its support of Guaidó as the interim president and in its support of his government." *Id.*

The National Assembly and Interim President Guaidó have taken steps to exert control over the Republic and its instrumentalities, including the Defendants herein. A few of these efforts are important to the motion at hand. On February 5, 2019, the National Assembly passed the *Statute Governing the Transition to Democracy to Restore the Validity of the Constitution of the Bolivarian Republic of Venezuela* (the "Transition Statute"). *See* (Doc. No. 38-5). Pursuant to the authority provided under the Transition Statute, Interim President Guaidó appointed Jose Ignacio Hernández Gonzalez to the role of Special Attorney General ("Special Attorney General Hernández") and also appointed five individuals to serve as the Ad-Hoc Board of Directors for PDVSA. On April 5, 2019, the National Assembly also passed the *Resolution Authorizing the President in Charge of the Republic, Juan Gerardo Guaidó Marquez to Extend the Powers Granted and to Increase the Number of Members of the Ad-Hoc Management Board of Petroleos de Venezuela, S.A. (PDVSA)* (the "Resolution"). (Doc. No. 52-1).

Special Attorney General Hernández and the PDVSA Ad-Hoc Board, exercising the authority provided under the Transition Statute and the Resolution, chose Hogan Lovells to be "the only law firm authorized . . . to represent the rights and interests of subsidiaries of PDVSA, Bariven, S.A. and PDVSA Services, B.V." in the present proceeding. *See* (Doc. No. 52-3 at 4).

From the facts alleged in the record, the transition has not gone as smoothly as hoped, at least with respect to PDVSA and its subsidiaries. Last fall, Hogan Lovells represented to this Court that "the Guaidó government currently does not have access to the personnel who would be most knowledgeable about the claims at issue, and therefore is unable, until a full transition occurs,

4

to respond to the claims." *See* (Doc. No. 23 at 2). Since that representation, no party has suggested any change in circumstances.

## II.

A few matters seem firmly settled.

*First*, the United States has recognized Interim President Guaidó as the legitimate leader of Venezuela. On January 23, 2019, the President issued a statement "officially recognizing the President of the Venezuelan National Assembly, Juan Guaidó as the Interim President of Venezuela." The White House, *Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaidó as the Interim President of Venezuela* (Jan. 23, 2019), available at https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-interim-president-venezuela/. In doing so, the President also recognized the illegitimacy of the Maduro regime. *Id.* Nothing has changed since this date. Indeed, as mentioned above, in a letter accompanying the Statement of Interest filed by the United States, Ambassador Kozak emphasized that "the United States remains steadfast in support of Guaidó as the interim president and in support of his government." *See* (Doc. No. 43-1 at 1).

*Second*, it is beyond the adjudicative powers of this Court to question the Executive Branch's recognition of the Guaidó Government. The Supreme Court has held that the Executive Branch holds the exclusive power to recognize foreign nations and governments. *Zivotofsky*, 576 U.S. 1. In light of *Zivotofsky* and the acts by the President and State Department officially recognizing the Guaidó Government, the Court need not inquire any further into the legitimacy of Interim President Guaidó.

*Third*, the legitimacy of Interim President Guaidó confers presumptive validity to the acts of his regime that occur within Venezuela, including commercial acts. Under the act of state doctrine, "the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). The Supreme Court has held that the act of state doctrine is "a principle of decision binding on federal and state courts alike," under which "the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405, 406 (1990) (internal citations and quotations omitted). Importantly, the act of state doctrine only applies to official acts taken by a recognized sovereign. *See In re Refined Petroleum Prod. Antitrust Litig.*, 649 F. Supp. 2d 572, 582 (S.D. Tex. 2009) (citing *Underhill*, 168 U.S. at 254). Applied here, the Court will not question the validity of any laws promulgated by the Venezuelan National Assembly or any acts taken by Interim President Guaidó pursuant to those laws. In accord with other courts confronted by similar issues, this recognition extends to acts regarding the management of Venezuela's state-owned corporations. *See Republic of Panama v. Air Panama Internacional, S.A.*, 745 F. Supp. 669, 672 (S.D. Fla. 1988) (holding that act of state doctrine foreclosed judicial inquiry into Panamanian corporate law with respect to the validity of managerial appointments by legitimate president of Panama); *Jimenez v. Palacios*, No. CV 2019-0490-KSJM, 2019 WL 3526479, at *11–*20 (Del. Ch. Aug. 2, 2019), as revised (Aug. 12, 2019) (holding that Interim President Guaidó lawfully reconstituted the PDVSA board of directors).

### III.

Despite the principles set out above, GST and Hogan Lovells dispute who has authority over Defendants to appoint counsel here. Before considering this issue, the Court notes, as it has alluded to before, that there are two frameworks of control and authority suggested by the

briefing—*de jure* and *de facto* control. *De jure* control refers to the control that arises as a matter of right. On the other hand, *de facto* control refers to control that arises as a matter of fact, without respect to whether a right to such control exists. *Cf. Boumediene v. Bush*, 553 U.S. 723, 754–55 (2008) (discussing control over Guantanamo Bay which the Court considered to be under the *de jure* sovereignty of Cuba, even though the United States held *de facto* sovereignty "by virtue of its complete jurisdiction and control of the base").

To begin, the Court finds that Special Attorney General Hernández and the Ad-Hoc Management Board of PDVSA clearly possess *de jure* control over the Defendants.

As a threshold matter, the Court finds that all Defendants are "State-Owned Companies" as that term is used in Venezuelan law. In 2014, Venezuela passed the Venezuelan Organic Law of the Public Administration ("LOAP," by its Spanish acronym). *See* (Doc. No. 38-4). Under Article 103 of the LOAP, "State-Owned Companies are legal entities of public law incorporated according to the rules of private law, in which the Republic . . . , alone or jointly, ha[s] a stake larger than fifty percent of the capital stock." *Id.* at 5. It is without question that Defendants fall within this definition articulated by that act. None of the parties contest that the Defendants are wholly owned, either directly or indirectly, by Venezuela.[3]

1.

The next question then is whether, under the Transition Statute,[4] the Special Attorney General is permitted to appoint counsel on behalf of State-Owned Companies. Article 15.b of the Transition Statute provides:

> [T]he acting President of the Republic may designate a person to act as a special prosecutor for the defense and representation of the rights and interests of the Republic, **State companies**, and other decentralized entities of the Public

---

[3] As per the pleadings, PDVSA is 100% owned by the Republic, Bariven is 100% owned by PDVSA, and PDVSA Services is 100% owned by Bariven.
[4] Under the act of state doctrine, this Court will not question the validity of the Transition Statute.

7

> Administration abroad. ***Said special prosecutor shall have the capacity to appoint legal representatives***, including in international arbitration proceedings, and shall exercise the powers mentioned in numerals 7, 8, 9, and 13 of article 48 of the Organic Law of the Office of the Attorney General of the Republic, subject to the limitations derived from article 84 of that Law and from this Statute.

(Doc. No. 38-5 at 13) (emphasis added). GST argues that the text of the Transition Statute contains specific limitations on the powers of the special prosecutor, only permitting him to exercise to those found in articles 7, 8, 9, 13, and 84 of the Organic Law of the Office of the Attorney General of the Republic (the "Attorney General Law"), which are incorporated into the Transition Statute. None of these provisions, GST contends, permit appointment of counsel for State-owned entities.

The Court disagrees with GST's interpretation of the Transition Statute. To begin, the text of the Transition Statute uses the conjunctive "and" when enumerating the powers of the Special Attorney General. As such, a strict textual reading of the statute provides that the Special Attorney General (1) shall have the capacity to appoint legal representatives for the aforementioned purpose of defending the rights and interests of, *inter alia*, state companies abroad; and (2) "shall exercise the powers mentioned in numerals 7, 8, 9, and 13 of Article 48" of the Attorney General Law. *See* (Doc. No. 38-5 at 13). Further, and perhaps more dispositive, the purported limitations on the Special Attorney General's power under GST's reading of the statute would inhibit the Special Attorney General from providing important representation for the Republic. GST contends that the Transition Statute recognizes the rights of the State-owned entities, and not the Special Attorney General, to appoint their own counsel. To achieve that purpose, GST argues that the Transition Statute specifically limits the authority of the Special Attorney General to "arts. 7, 8, 9, 13, and 84 of the Attorney General Law," none of which include the authority to represent State-owned entities. (Doc. No. 35 at 18). However, the Transition Statute does not refer to most of the pertinent articles. If the Court were to limit the powers conferred by the Transition Statute to those

8

specifically enumerated, the Special Attorney General would only be permitted to exercise the powers found in ***numerals 7, 8, 9, and 13 of article 48*** of the Attorney General Law.[5] These numerals grant the Special Attorney General certain powers of appointment within the Attorney General's office.[6] Even GST does not suggest that the statute intends to restrict Special Attorney General's authority to only these numerals (at least not on statutory construction grounds).[7] Such an interpretation would create a gaping hole in the Special Attorney General's ability to represent the Republic. Importantly, it would exclude authority under Article 9[8] of the Attorney General Law, which permits the Attorney General to represent the Republic itself in legal proceedings relating to breach of contract actions. *See* (Doc. No. 35-13 at 3). Indeed, under that approach there would be no person empowered to represent the Republic if it were named in such a suit.

In accord with the conjunctive language found in article 15.2 of the Transition Statute, the Court finds that the Special Attorney General possesses the lawful right to appoint representation for State-owned companies, including Defendants here. Interim President Guaidó appointed Special Attorney General Hernández to that position, and Special Attorney General Hernández appointed Hogan Lovells to represent Defendants.

---

[5] This text is bolded to emphasize that the relevant portions of the Transition Statute only mentions numerals 7, 8, 9, and 13, and not articles 7, 8, 9, and 13, as GST suggests.

[6] Numeral 9 provides the authority to appoint individuals where the representation of the Republic's interest requires. Neither party has suggested that this provides independent authority to make the appointment at issue here.

[7] GST argues that "arts. 13 and 84 [of the Attorney General Law] limits [sic] the authority of the Attorney General to the representation of the Republic (not state entities)." (Doc. No. 35) (citing Doc. No. 35-13). GST did not provide the Court with copies of Articles 13 or 84, but a review of the law suggests that these restrictions actually refer to other topics. Generally, it appears Article 13 requires contracts containing arbitration clauses to be referred to the Attorney General, while Article 84 prohibits attorneys representing the Republic from engaging in alternative dispute resolution without the consent of the Attorney General. Ley Orgánica de la Procuraduría General de la República, TU ABOGADO.COM (January 30, 2016), http://ley.tuabogado.com/leyes/decretos/ley-organica-de-la-procuraduria-general-de-la-republica-30-dic-2015.

[8] This refers to Article 9 of the Attorney General Law, not Numeral 9 of Article 48 of the Attorney General Law.

**2.**

Similarly, the Court finds that the Ad-Hoc Management Board of PDVSA possesses lawful authority over the Defendants to appoint counsel. The Transition Statute empowered Interim President Guaidó to appoint an Ad Hoc Management Board of PDVSA to "exercise the rights of PDVSA as a shareholder of PDV Holding, Inc." (Doc. No. 38-5 at 20). Pursuant to the authority vested in him by the Transition Statute, Interim President Guaidó appointed five individuals to form the Ad-Hoc Management Board. On April 5, 2019, the National Assembly passed the Resolution. (Doc. No. 52-1). Under the Fourth Article of the Resolution, the "Ad-Hoc Management Board of [PDVSA], together with the Special Prosecutor appointed by the President in charge of the Republic shall exercise the legal representation of [PDVSA], and its subsidiaries abroad." *Id.* at 4. Hogan Lovells submitted a letter from Special Prosecutor Hernández and Luis Pacheco, the chairman of the Ad-Hoc Management Board, confirming the choice of Hogan Lovells to represent PDVSA and its subsidiaries in this litigation and others. *See* (Doc. Nos. 52-2 & -3). Taken together, these provisions and actions show that Hogan Lovells was lawfully appointed to represent Defendants.

**3.**

The Court disagrees with GST's arguments that its appointers have the right to do so under private law. GST's cites to the bylaws of PDVSA, Bariven, and PDVSA B.V., arguing that a straightforward application of these governing documents shows PDVSA's general counsel should be permitted to appoint counsel. *See* (Doc. No. 35 at 17–18).[9] Further, GST's briefing suggests

---

[9] Under PDVSA's bylaws, the "Judicial Representative" is the "only employee, except for the duly constituted representatives, with the power to judicially represent the Company" and to similarly grant "general or specific powers-of-attorney required by the Company with the powers he deems relevant to best defend the Company's rights and interests." (Doc. No. 35-12 at 40–41) (PDVSA Bylaws at Art. 36). Similarly, Bariven's bylaws provide for a Legal Representative who shall be the sole official, with the exception of the proxies duly established, with power to legally represent the Company" and the power to "award legal powers, general or special, that the Company may require." (Doc. No. 35-14 at 29) (Bariven Bylaws at Clause 27). Finally, under the bylaws of PDVSA B.V, the

10

that "PDVSA's board, as appointed by Mr. Maduro," could appoint GST as counsel. (Doc. No. 35 at 20). These contentions are wrong for multiple reasons.

First, as it applies to both arguments, the letter signed jointly by Special Attorney General Hernandez and Ad-Hoc Board Chairman Pacheco qualifies as an act of state that must be given deference here. In pertinent part, the letter states that Hogan Lovells is "the only law firm authorized . . . to represent the rights and interests of subsidiaries of PDVSA, Bariven, S.A. and PDVSA Services, B.V." in the present proceeding. *See* (Doc. No. 52-3 at 4). No further analysis into conflicting by-laws or actions by the Maduro-appointed board is necessary. Rather, "[t]he act of state doctrine . . . obviates the need to inquire into private [Venezuelan] law," as it pertains to this exclusive appointment. *See Air Panama*, 745 F. Supp. at 673.

Second, the National Assembly has barred those appointed by former-President Maduro from exercising any power over PDVSA or its affiliates. Under article six of the Resolution:

> As long as the usurpation of the Presidency of the Republic exists and in accordance with the Statute that Governs the Transition to Democracy to Restore the Validity of the Constitution of the Bolivarian Republic of Venezuela, all rights and powers which correspond to the Shareholders Meeting, the Board of Directors and the Presidency of Petróleos de Venezuela, S.A. (PDVSA) and its affiliates incorporated in Venezuela, existing or appointed after January 10, 2019 as well as those rights and powers of the Ministry responsible for hydrocarbons and, in general any other ministry, body or entity that may act on the Republic's name or behalf at the Shareholders' Meeting of Petroleos de Venezuela, S.A. (PDVSA) and its subsidiaries incorporated in Venezuela are hereby suspended.

(Doc. No. 52-1 at 5). In doing so, the National Assembly stripped all management power from the previous regime and vested it in the Ad-Hoc Management Board. Therefore, any actions taken by the board of directors appointed by Maduro to PDVSA are null and void, including its appointment of GST for legal representation here.

---

decision of which counsel to appoint is vested in the company's board of directors. *See* (Doc. No. 35-15 at 10) (PDVSA B.V. Bylaws at Art. 14).

## IV.

From the evidence before this Court, one complicating issue may yet exist. Assuming the briefing to be true, it appears the Maduro regime still may possess *de facto* control over Defendants.[10] Hogan Lovells has admitted as much. In 2019, Hogan Lovells made concessions in other cases that Interim President Guaidó "does not yet have total control over Venezuela's State-owned companies based in Venezuela" nor do they "have access to documents, information or witnesses." *Comparelli et al. v. Bolivarian Rep. of Venez. et al.*, No. 14-cv-24414 [ECF No. 132] at 2 (S.D. Fla. March 18, 2019); *see also CLADirect v. Bariven, S.A. et al.*, No. 19-cv-553 [ECF No. 25] (S.D. Tex. Aug. 8, 2019) ("The Maduro regime has prevented the incoming Guaidó government from accessing the information and government administrative functions that would allow it to fully and effectively exercise its authority."). Similar concessions have been made here. Last fall, Hogan Lovells informed the Court that "the Guaidó government currently does not have access to the personnel who would be most knowledgeable about the claims at issue, and therefore is unable, until a full transition occurs, to respond to the claims." *See* (Doc. No. 23). Since this time, neither Hogan Lovells nor GST has provided any evidence to the Court suggesting the situation has changed. *See also Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 135 n.2 (3d Cir. 2019) ("As a practical matter, there is reason to believe that Guaidó's regime does not have meaningful control over Venezuela or its principal instrumentalities such as PDVSA.").

---

[10] The Supreme Court has held that "[w]ho is the sovereign, *de jure* or *de facto*, of a territory, is not a judicial, but a political, question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens, and subjects of that government." *Jones v. United States*, 137 U.S. 202, 212 (1890). The Court refers to *de facto* control over PDVSA and its subsidiaries here, not in the legal sense, but instead in the practical context of being able to actively and ethically participate in the current litigation.

## A.

This places the Court in a somewhat tenuous position. On the one hand, refusing to permit a recognized government to speak on behalf its rightfully held instrumentality would, in a sense, provide legitimacy to the unrecognized regime. That would be in direct opposition to the statements by the President, and, by virtue of those statements, the position of the United States. It would also run counter to the Supreme Court's admonition that "[r]ecognition is a topic on which the Nation must 'speak ... with one voice,'" and "[t]hat voice must be the President's." *Zivotofsky*, 135 S. Ct. at 2086.

Nevertheless, there may be certain significant, yet unintended, ramifications to permitting GST to continue its representation of the Defendants. Defendants, being represented by GST, removed this case to federal court under the Foreign Sovereign Immunity Act. *See* (Doc. No. 1 at 1). If GST continues to represent the Defendants, the Court could theoretically be recognizing the entity as an instrumentality of an illegitimate regime. It is not entirely clear that an illegitimate regime, or its instrumentalities, are entitled to the protections of the Foreign Sovereign Immunities Act. *Cf. Zivotofsky*, 135 S. Ct. at 2086 (noting that "[l]egal consequences follow formal recognition," including the "benefit from sovereign immunity when they are sued"). Apart from the arguable impropriety of removal, this could also mean foregoing certain benefits, including the right to a non-jury trial, the exemption from punitive damages, extended time for answering complaints, and constraints against the attachment of or execution against property. *See* 28 U.S.C. §§ 1330, 1602–11.

On the other hand, practical considerations surrounding the progression of any civil suit necessitate access to the actual client and the ability to freely exchange information between attorney and client. Hogan Lovells has already informed the Court that "the Guaidó government

13

currently does not have access to the personnel who would be most knowledgeable about the claims at issue, and therefore is unable, until a full transition occurs, to respond to the claims." *See* (Doc. No. 23 at 2). Consequently, it remains to be seen whether that firm can adequately represent the Defendants as a practical matter. For example, a party may need access to documents that are responsive to a plaintiff's requests for production or to other sources of information necessary to respond to interrogatories and requests for admission. Further issues may arise in determining who the company will designate as its Rule 30(b)(6) witness, who "must testify about information known or reasonably available to the organization." FED. R. CIV. P. 30(b)(6). The Court cannot excuse compliance with the rules merely because one of the parties has chosen a law firm that cannot fulfill the duties entailed in that representation. That result would clearly penalize other parties who may be fully compliant.

### B.

All that being said, the Court finds that it should grant the motion filed by Hogan Lovells. This Court, nor any other court for that matter, is simply not situated to determine the proper balance of the practical considerations discussed above. As the Supreme Court has explained, "most federal judges [do not] begin the day with briefings that may describe new and serious threats to our Nation and its people." *Boumediene*, 553 U.S. at 797. Members of the Executive Branch do. The Court must assume that the President was apprised of and counseled on the practical ramifications of recognizing the Guaidó Government, including those presented in this motion. Understanding all that is at stake, the President made a decision. Representatives of the Executive Branch doubled down on that decision, appearing here and urging the Court to grant the motion to substitute. *See* (Doc. No. 43) (Statement of Interest of the United States). "While a Statement of Interest does not bind [a court], [the court] must 'give serious weight to the Executive

14

Branch's view of the case's impact on foreign policy.'" *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 952 n.14 (5th Cir. 2011) (quoting *Sosa v. Alvarez–Machain*, 542 U.S. 692, 733 n. 21 (2004)). Altogether, the Court finds deference is the best route.

This decision neither treads new ground nor stokes the already controversial fire. Indeed, the Supreme Court has counseled that "[w]hat government is to be regarded...as representative of a foreign state is a political rather than a judicial question, and is to be determined by the political department of the government." *Guaranty Trust Co. v. United States*, 304 U.S. 126, 137 (1938). Following this general principle, at least three courts have denied the Maduro regime the right to appear on behalf of Venezuela, instead permitting the Guaidó Government to appear. *See Crystallex* 932 F.3d at 135 n.2 (finding that, notwithstanding its apparent lack of meaningful control over Venezuela or PDVSA, "Guaidó's regime [is] authorized to speak and act on behalf of Venezuela in these appeals"); Order, *Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*, No. 18-7044, Doc. No. 1785518 (D.C. Cir. May 1, 2019); *OI European Group B.V. v. Bolivarian Republic of Venezuela*, No. 16-cv-01533, ECF No. 85 at pp. 9-10 (D.D.C. May 21, 2019) (following *Rusoro Mining*).[11]

Two cases suggest these principles can be extended to the commercial context, including to state-owned entities. First, in *Air Panama*, the Southern District of Florida held that the recognized government of Panama deserved an injunction preventing the transfer of funds or control from the state-owned airline to the illegitimate regime. 745 F. Supp. At 676. In that case, the former Commander of the Panamanian Defense Forces launched a coup, seeking to unseat the

---

[11] In its response, GST argues that "the court in *OIEG* allowed both governments to make argue and considered both their positions in granting the order." (Doc. No. 35 at 19–20). This is partially true. The court in *OIEG* stated that it considered the briefs submitted by the Maduro government, but it only did so in a provisional manner in the event its *Rusoro Mining* was incorrectly decided or found not to be binding or "the position of the Department of State change[d]." *OEIG*, Doc. No. 85 at 10–11. This provisional consideration does not disturb the prior holding that "recognize[d] the Guaidó government lawyers as the appropriate representatives of Venezuela." *OEIG*, Doc. No. 85 at 9–10.

15

Panamanian president. *Id* at 670. The Panamanian National Assembly took actions to remove the president. *Id.* In response, President Reagan announced the United States' commitment to the prior regime as the legitimate leaders of Panama. *Id.* at 670–71. The insurrection leader took control of the nation's state-owned airline, replacing the company's chief executive officer. *Id.* at 671. The recognized regime responded by appointing a new board of directors and management for the company, and filed suit seeking to injunction preventing the transfer of funds or control of the company. *Id.* The court in *Air Panama* granted a preliminary injunction, finding that United States recognition of the legitimate regime settled the question of control over the airline under the political question doctrine and the act of state doctrine. *Id.* at 677. The Court also denied a motion for attorneys hired by the illegitimate regime to appear on behalf of the airline. *Id.* at 671–72.

Second, in *Jimenez*, the Delaware Court of Chancery recently held that Interim President Guaidó held the authority to reconstitute the PDVSA board of directors. 2019 WL 3526479. Against a similar factual backdrop to this case, *Jimenez* considered the proper composition of the board of directors of three entities owned directly or indirectly by PDVSA. *Id.* at *1. The parties sought competing declarations that they comprised the rightful board of the entities. *Id.* The Court of Chancery held that, while a declaration was inappropriate in the procedural stage of the case, the political question and act of state doctrines mandated a finding that the Guaidó-appointed PDVSA board possessed management functions over PDVSA. *Id.* at *20–*21.

GST argues that section 205 of the Restatement (Third) Foreign Relations compels a finding in its favor.[12] That provision states that "[o]rdinarily, the policy of denying an unrecognized regime access to the courts does not extend to corporations owned by such a regime, or to an assignee of such a regime." RESTATEMENT (THIRD) FOREIGN RELATIONS § 205 cmt. a.

---

[12] Indeed, GST argues that the failure to consider the Restatement is reason enough to doubt the rationales of *Jimenez*, *Air Panama*, and the Statement of Interest. *See* (Doc. No. 35 at 20, 22); (Doc. No. 53 at 3).

16

GST's argument vastly misstates the circumstances in which access to United States courts would be appropriate. It is invariably true that if an unrecognized regime were to create within itself a company to do business with others federal courts should recognize that company. *See Upright v. Mercury Business*, 13 A.D. 2d 36, 38 (N.Y. App. Div. 1961) ("Even the power of a rebel government in one of the Confederate States to create a corporation with capacity to sue the United States Government was admitted where such creation was not directly in furtherance of the rebellion."). In effect, this concept affords the illegitimate regime the same rights as a private party. While a regime may not be legitimate, it holds just as much of a right to organize a commercial enterprise even if it is under the banner of unrecognized regime. Importantly, that is not what occurred here. PDVSA was (and still is) owned by the Republic. The position of the United States is that the Maduro regime has unjustly appropriated the inheritance of the Venezuelan people and pillaged its assets for personal benefit. *See* White House, *President Donald J. Trump Supports the Venezuelan People's Efforts to Restore Democracy in Their Country* (Jan. 29, 2019) ("The United States will not tolerate those who seek to . . . loot Venezuelan resources to enrich themselves at the expense of the people."). The Restatement does not require federal courts to condone such actions. Indeed, the principal case cited by the Restatement in support of the proposition in comment a disavows this argument. *See* RESTATEMENT (THIRD) FOREIGN RELATIONS § 205 (citing *The Maret*, 145 F.2d 431, 442 (3d Cir. 1944) (holding that United States courts could not recognize ownership of Estonian vessel by an unrecognized sovereign that made decrees nationalizing said vessel which was previously owned by private parties)); *see also The Maret*, 145 F.2d at 442 (permitting agent of company which was organized under the laws of the unrecognized sovereign and chartered ships on behalf of the unrecognized sovereign to appear in United States courts).

## V.

For the foregoing reasons, the Court **GRANTS** Hogan Lovells' Motion for Substitution of Counsel. **IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that Bruce D. Oakley and Aaron R. Crane, and the law firm of Hogan Lovells US LLP, are designated as counsel of record for Defendants in place of Rodney Quinn Smith, II, Katherine Alena Sanoja, Gary J. Shaw, and Bethel Kassa, and the law firm of GST LLP, who are hereby discharged.[13] Bruce D. Oakley is designated as the attorney in charge.

Signed this 20th day of May, 2020.

Andrew S. Hanen
United States District Judge

---

[13] This motion has described above certain difficulties that might arise in the future should Hogan Lovells prevail in its efforts to be recognized as counsel. By so ruling, this Court is not suspending either the rules of civil procedure or any other requirements with which a party in a lawsuit must comply. The Court expects Defendants to comply with all the duties that accompany being a litigant in federal court.